UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRIAN F. ROGERS,

        Plaintiff,

    v.

CITY OF SAN FRANCISCO, et al.,

        Defendants.

Case No. 23-cv-04997-JCS

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 68, 70

## I.    INTRODUCTION

In this employment discrimination case, Plaintiff Brian Rogers has sued the City of San Francisco ("the City") and the San Francisco Public Utilities Commission ("SFPUC"), alleging that the SFPUC failed to hire him for a Senior Account Clerk position based on his race.[1] Presently before the Court are the parties' cross-motions for summary judgment. A hearing on the motions was held on July 9, 2025. For the reasons stated below, the Court GRANTS Defendant's motion and DENIES Plaintiff's motion.[2]

## II.    BACKGROUND

### A.    Factual Background[3]

In December 2022, Rogers applied for the 1632 Senior Account Clerk position at the

---

[1] "[A] city department such as the Public Utilities Commission may be sued only if it has the capacity to sue or be sued under the city charter." *Leland v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1089 (N.D. Cal. 2008) (citing *Talbot v. City of Pasadena*, 28 Cal.App.2d 271, 274, 82 P.2d 483 (1938)). Because the SFPUC "has no capacity to sue or be sued under the San Francisco Charter[]" it is not a proper defendant. *Id.* (citing SF Charter §§ 1.101, 8B.121). Therefore, SFPUC is DISMISSED without prejudice.

[2] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

[3] The facts set forth below are the ones the Court finds to be undisputed, unless otherwise stated.

United States District Court
Northern District of California

United States District Court
Northern District of California

SFPUC. Declaration of Michelle Chee in Support of Defendants' Motion for Summary Judgment, dkt. no. 70-1 ("Chee Decl.") ¶ 3.[4] According to Michelle Chee, Senior Human Resources Analyst with the SFPUC, at that time, the SFPUC had two vacancies for the position, both of which were temporary positions with a duration of approximately three years. *Id.* Although the City's human resources department maintains an eligibility list for permanent 1632 positions based on the results of an examination that is administered every two years, that list did not apply to the 1632 positions for which Rogers applied because they were temporary; thus no examination was required. Deposition of Vivian Chen, dkt. no. 61-1 (Chen Dep.) at 20-21.

The 1632 Senior Account Clerk position "is an accountant type position within the Financial Services and Accounting Services division of the [SFPUC] whose duties include bookkeeping and financial record keeping, dealing with accounts payable and receivable and accounting software, verifying and balancing financial transactions, and working collaboratively with a team and clerical staff." Chee Decl. ¶ 5 & Ex. B (job description); *see also* Declaration of Brian F. Rogers in Support of Plaintiff's Motion for Summary Judgment, dkt. no. 64 ("Rogers Decl.") ¶ 6 ("The 1632 Senior Account Clerk position had primary responsibility for accounting for state contracts, contributions, grants tracking revenue recognition, reviewing monthly invoices for contracts, and providing compliance reports.").

The job description for the 1632 Senior Account Clerk position lists the following required

---

[4] In his reply brief, dkt. no. 80 ("Rogers Reply"), Rogers asserts that the "Yee Declaration" is "irrelevant to this legal matter because she had no involvement with Plaintiff in this case[ ]" and asks the Court to "discard her entire declarative testimony[,] [which] must be stricken from the record." Rogers Reply at 11. Plaintiff clarified at the motion hearing that this objection relates to the Chee Declaration. Chee describes the basis for her personal knowledge of the statements in her declaration as follows:

> I am a Senior Human Resources Analyst with the San Francisco Public Utilities Commission, Human Resources Division. I have held that position for four years. I supervise our onboarding and offboarding team, and manage the team responsible for recruitment of our Water Enterprise. In my capacity in that position, I have access to human resources documents and archives, including position files for past recruitments, which include position announcements, job descriptions, correspondence regarding recruitments, and interview notes and summaries. I also have access to information regarding which candidates were ultimately selected.

Chee Decl., ¶ 2. The Court finds that Chee has established personal knowledge of the facts set forth in her declaration and therefore overrules Rogers' objection.

"knowledges, skills and abilities":

> Knowledge of: financial record keeping and elementary accounting methods such as posting, adjusting, balancing, reconciling and single entry bookkeeping; office clerical procedures such as filing, coding, indexing and proofreading accounting documentation; and elementary mathematics.

> Ability to: analyze financial record keeping problems and suggest corrective actions; prepare and analyze financial reports; coordinate and inspect the work of a small clerical unit; perform accurate mathematical calculations; establish effective working relationships with departmental and non-departmental staff; apply accounting principles to a complex accounting system; navigate through and perform tasks in the various computer software (accounting systems, tax programs, spreadsheets, word processing and database systems) required for financial transactions; and communicate effectively both orally and in writing.

Chee Decl., Ex. B. It lists the following "minimum qualifications":

> Eighteen (18) months (equivalent to 3,000 hours) of verifiable experience processing financial and accounting matters (e.g. cost records, deposits, expenditures, allocations), bookkeeping and/or financial record keeping. Such experience typically includes verifying correctness of financial documents; maintaining expenditure records; and reconciling subsidiary accounts[.]

> Substitution of Experience:  15 semester units (or equivalent quarter units) of coursework from an accredited college or university with a minimum of 6 semester units (or equivalent quarter units) in accounting may be substituted for up to six (6) months of the required experience as described above.

*Id.*

According to Rogers, his skills and experience exceed the minimum requirements for the 1632 Senior Account Clerk position. Rogers Decl. ¶ 11. He has a Bachelor of Science degree in business administration with a concentration in finance and a minor in economics. *Id.* He also has "accounting and finance experience in various roles throughout his career which includes bank reconciliations, account reconciliations, compilation of financial and accounting records, purchase orders, journal entries, check disbursements, internal accounting controls, analyzing contract orders, reviewing source documents, aging schedules, collections, budget allocations, posting journal entries, cash management, treasury management, [and] cost accounting[.]" *Id.*

Rogers was invited for an interview, which was conducted in person on January 25, 2023.

United States District Court
Northern District of California

Chee Decl. ¶ 6.  Generally, interviews were conducted remotely by Zoom but Rogers was invited to interview in person because of "an equipment malfunction."  Rogers Decl. ¶ 5;  Chen Dep. at 30 (testifying that Rogers was asked if he wanted to come in for an interview because his "computer did not have a camera or [his] camera did not work.").  He was interviewed by a panel of three SFPUC employees: "(1) Cash Management Supervisor Olena Volynets, (2) Accounting Operations Manager Howard Huang, and (3) Manager of Capital Projects, Grants, Fixed Assets, and Debts Accounting Sanda Thaik."  Chee Decl.  ¶ 7.  According to Rogers, originally the panel was to include Evelyn Diolazo, who Rogers contends is Asian, but her place was taken by Volynets because Diolazo was on vacation.  Rogers Motion at ECF p. 14 (citing Rogers Ex. H-1).

The same panel interviewed all eight candidates who received interviews for the position. Chee Decl. ¶ 8.  Rogers contends Volynets is Ukrainian, Thaik is Burmese and Huang is Asian. Rogers Decl., Ex. G (chart apparently created by Rogers listing "race" and "gender" of each interview panelist).  It is not clear how Rogers determined the race/ethnicity of the interview panelists or whether these facts are disputed. The City stipulated at the motion hearing, however, that none of the interviewers was African-American.  Huang and Thaik were the hiring managers for the position. Chen Dep. at 13-14.

"The interview panel used a standard interview form and grading rubric for every candidate. The form contained five (5) interview questions, examples of strong responses for each, a space for interviewer notes, and a space to mark a score of one through five for the candidate's response to each question, with '1' being the lowest grade and '5' the highest."  Chee Decl. ¶ 9; *see also* Rogers Decl. ¶ 7 ("The interview was a three group panel interview in which five separate questions were asked collectively by the panel.").  The form contains a "scoring key" that subdivides the 1-5 scale into three categories: "Insufficient Response" (from 1 to around 2 and a half); "Average Response" (from around 2 and a half to around 4 and a half); and "Strong Response" (from around 4 and a half through 5).  *See, e.g.,* Chee Decl., Ex. C.

The five questions on the standard interview form were as follows:

- Question # 1
  Briefly describe your relevant work experience, training and background. Why do you think your experience makes you a good candidate for this

4

position?

Appropriate responses may include, but are not limited to:

• Describes duties processing & reviewing Accounts Payable documents or accounting transactions
• Describes working with multiple departments
• Describes resolving problems with vendors or customers
• Has performed responsible accounting & reporting work.
• Describes serving as lead accounting clerk (the "go to" person), either formally or informally
• Describes any problem-solving tasks

- Question #2
  How did you ensure entries and records were kept consistent with accounting principles? How did you ensure good internal control procedures?

  Appropriate responses may include, but are not limited to:

  • Segregation of duties
  • Review and approval process taken (multiple signatures)
  • Knowledge and understanding of the organization's policies and procedures

- Question #3

  Describe your experience being responsible for multiple tasks at the same time. How did you stay within deadlines? What technologies did you use that allowed you to track and follow through on a high volume of work with attention to detail?

  Strong responses may include, but are not limited to:

  • Display strong values and work ethics to able to meet a tight deadline.
  • Illustrate the ability to distinguish between urgent and important tasks, keep to do lists and work plans, prioritize and schedule work, time management, delegation, and collaboration.
  • Demonstrate the ability to manage work using technologies such as running daily query reports for pending workloads and progress, and utilizing outlook reminders or similar tools for deadlines and key dates.

- Question #4
  Computer skills are important for this position. Describe your experience with PeopleSoft, Oracle or other Financial Accounting Software Systems including their purpose & function. Describe the most complex spreadsheet that you created using MS Excel and advanced Excel functions such as pivot tables and v-lookup.

  Strong responses may include, but are not limited to:

  • Describe work experience with PeopleSoft or other financial software.
  • Provide examples of complex Excel spreadsheet problems focusing on manipulation of large volumes of data and use of complex functions such as V Lookup, Pivot Table, Macros, Graphs, etc.
  • Describe a process for creating and generating regular financial reports.
  • Describe exporting data to Excel or Access to manipulate data.

- Question #5
Imagine you receive a call from an angry vendor demanding why they have not received payment for an invoice submitted. The vendor explains that the invoice is now two (2) months late. Briefly describe how you would handle this situation.

   Strong responses may include, but are not limited to:

   • Demonstrate good customer service skills: polite, apologize, listen, be helpful, follow-up
   • Ascertain the details of the invoice from the vendor and research
   • Find out whom the vendor dealt with at the division level
   • Call the employee to determine what the problem is, if any, at the division level
   • Determine where the invoice is and the reason for the delay
   • Notify accounting team leader of the situation and try to pay the bill, if possible. Notify the vendor when the check will be issued

Chee Decl., Exs. C, D, E. At the end of the form, there is a space for "overall comments." *Id.*

According to Vivian Chen, a SFPUC employee who was involved in scheduling interviews for the position, an applicant had to "be qualified in order . . . to be picked for the interview." Chen Dep. at 23. Chen testified that hiring at SFPUC is "tailored towards" the goal of diversity. *Id.* at 24. In particular, she testified as follows:

> All the interview panelists, that is a diverse group, and we are not allowed to see the candidate's race, age as hiring managers. This is just general, not specific to a position. The general process in the City, its hiring managers do not know the candidates' protected categories. We pick candidates purely based on their qualification for interview, and the interview panelists must be diverse, meaning it can't be just one group or, you know, like -- or all male or all female. It has to be a combination of different factors. That's a rule from our H.R.

*Id.* Chen testified that "[f]or [temporary] positions like this one, . . . 100 percent [of the hiring decision was . . . based on the interview] once the candidate [is found] qualified to be interviewed . . . ." *Id.* Chen also testified that "in terms of candidate's response to the interview questions, there's no right or wrong." *Id.* at 17. Chen testified that with respect to the interviewers' notes that while interviewers "try to take down as much as they can during the interview, . . . it's not always 100 percent, meaning it depends also on the speed of the interviewee. And also, not all interviews – not all interviewers write down everything." *Id.* at 18-19.

All three panel members scored Rogers at 3 or above on each of the five questions. Chee Decl., Exs. C, E & F. Although Rogers contends the panel members "never inquired about [his]

6

1    background during the interview such as his prior experience or education for the 1632 Senior

2    Account Clerk position[,]" Rogers Decl. ¶ 8,  the notes of all three interviewers on the panel

3    included comments with reference to Question 1 (asking for a description of "relevant work

4    experience, training and background") describing Rogers' work history and educational

5    background.  Chee Decl., Exs. C, D & E.  Volynets wrote in the "overall comments section" that

6    Rogers did "[n]ot [have] enough experience and knowledge in area required for hiring."  Chee

7    Decl., Ex. C.  Thaik wrote in the overall comments section: "AP, AR, GL, and Accounting Cycle

8    Exp. Able to answer all questions but short mentioning and did not provide example. Very clam

9    [sic] and no enthusiastic[.]"  Chee Decl., Ex. D.  Huang left the "overall comments" section blank.

10   Chee Decl., Ex. E.

11       Rogers was ranked seventh out of the eight candidates, with a score of 49.  Chee Decl.,

12   Ex. F.  The top-ranked candidate, who received a score of 67, was offered a position but did not

13   accept it.  *Id.* According to Rogers, this candidate was Meaka Liu, an Asian female.  Rogers

14   Motion at ECF pp. 22-23; *see also* Rogers Ex.  Z. The second and third ranked candidates, with

15   scores of 59 and 58, respectively, were offered the positions and accepted.  *Id.*  The two

16   individuals who accepted the position were Mya Moehammady and Rachel Chen.  Chen Dep. at

17   12.   Based on these individuals' surnames, Rogers surmises that these individuals are Asian.

18   Declaration of Amy Super in Support of Defendant's Motion for Summary Judgement, or in the

19   Alternative, Summary Adjudication, dkt. no. 70-3 ("Super Decl."), Ex. A (Rogers Dep.) at 29-30.

20   However, Vivian Chen testified that she did not know the race or ethnicity of the individuals who

21   filled the two positions.   Chen Dep. at 11.  The City stipulated at the motion hearing that none of

22   the individuals who was offered a position was African-American.

23       Chen testified at her deposition that the SFPUC employes between two and three thousand

24   people, and that as deputy chief financial officer she oversees approximately 60 people who work

25   on one of two teams: an accounting services team and a financial reporting and analysis team.  *Id.*

26   at 9.   Chen testified that of the 60 individuals who worked under her on the accounting and

27   finance teams at SFPUC, there previously had been three African-American employees but that

28   two of them had retired.  *Id.*  at 32.

1          On March 7, 2023, Rogers contacted the SFPUC to inquire about the status of his

2   application, having received no notification of the results of his interview, and was told that he had

3   not been selected for the position.  Rogers Decl. ¶ 12.

4       **B.   Plaintiff's Claims**

5          The operative complaint is the Amended Complaint that was filed on April 5, 2024, dkt.

6   no. 32.  The Court construes the Amended Complaint as asserting the following claims: (1)

7   violation of the equal protection clause of the 14th Amendment of the U.S. Constitution, under 42

8   U.S.C. § 1983; (2) discrimination on the basis of race in violation of Title VII of the Civil Rights

9   Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*; and (3) discrimination on the basis of race

10  in violation of the California Fair Employment and Housing Act ("FEHA"), Cal., Gov't Code §

11  12940(a).[5]

12      **C.   The Motions**

13         The parties have filed cross-motions for summary judgment, with each side asserting they

14  are entitled to summary judgment in their favor on Rogers' claims.

15        **1.   Plaintiff's Motion**

16         Rogers seeks summary judgment in his favor on all of his claims, asserting that he has

17  established, as a matter of law, that he was qualified for the 1632 Senior Account Clerk position,

18  that "the SFPUC did not have a legitimate reason for not hiring [him][,]" and that its failure to hire

19  him was pretextual.  Rogers Motion for Summary Judgment, dkt. no. 68 ("Rogers Motion") at

20  ECF p. 7.  According to Rogers, he has "clear and convincing evidence from various discoverable

21  internal documents that the City has no legitimate business reason which was actually false or

22  pretextual[.]"  *Id.*  He further asserts that "the City's key witnesses, namely Olena Olyvets,

23  Howard Huang, and Sanda Thaik[,] gave no legitimate, nondiscriminatory reason for the actions

24  taken against Rogers[ ]" and that "their reasoning was highly subjective, ambiguous, and

25  obnoxious."  *Id.*

26

27  ─────────────────────

28  [5] Plaintiff stipulated at the motion hearing that although he asserted two FEHA claims in his
    complaint, those claims are duplicative and that he is asserting only one FEHA claim in this case.

United States District Court
Northern District of California

1    Rogers argues that he met the requirements for the 1632 Senior Account Clerk Position,

2    which "did not necessarily require an accounting degree" as the requirement of "15 semester units

3    of coursework from an accredited college or university with a minimum of 6 semester units in

4    accounting could be substituted for up to six months of the required experience." *Id.* at ECF p. 9.

5    Rogers contends he has such experience as he holds a "Bachelors of Science degree in Business

6    Administration with a concentration in finance and a minor degree in economics" and "has worked

7    within the fields of accounting and finance since at least 1994 with various roles in accounting and

8    finance occupations." *Id.*; *see also* Chee Decl., Ex. A (Rogers Application for 1632 Senior

9    Account Clerk position, listing education and experience in finance and accounting dating back to

10   2002). Rogers contends that despite these qualifications, the three interviewers on the panel

11   deemed him "unqualified" for the position. *Id.* [6] But according to Rogers, "the interview panel

12   notes did not reflect that [he] performed poorly relative to others who interviewed with the panel."

13   *Id.* at ECF p. 10. Thus, Rogers asserts, "there was no apparent legitimate reason or basis for the

14   subjective scoring[,]" indicating that his "race was a primary and major motivating factor for [the

15   panel's] decision to decline to hire plaintiff." *Id.* Rogers asserts that the City "uses an ambiguous

16   and subjective numbering or rating system at the interview" and that in his case, "[t]he SFPUC

17   gave preferential hiring treatment to the Asian candidates solely because the interviewers were

18   also Asian." *Id.*

19       Rogers further asserts that the SFPUC's professed dedication to diversity and equal

20   opportunity employment is a "farce" and that "the City's hiring of City employees at the SFPUC

21   shows substantial racial discrimination and bias within its accounting department." *Id.* at ECF p.

22   11. According to Rogers, "[t]he SFPUC is racially biased as it supports an illegal motive to favor

23   Asian applicants and candidates over more qualified, or at least as qualified black candidates." *Id.*

24   In support of this assertion, Rogers points to a chart that purports to show the racial/ethnic

25   breakdown of senior account clerks employed by the City of San Francisco. Rogers Motion at

26

27   ──────────────

28   [6] Rogers does not provide a citation to the record in support of this contention. He may be
     referring to the comment of interviewer Volynets in the "overall comments" section of the form,
     discussed above. *See* Chee Decl., Ex. C (Volynets interview notes).

9

1    ECF pp. 17-18 (citing Rogers Ex. V). [7] The chart appears to reflect that a majority of the

2    individuals who hold this position are Asian, that only a handful of Caucasians hold the position

3    and that no African-Americans hold this position. *Id.*

4         Rogers also points to Chen's testimony about the interview process, which he contends is

5    flawed, to support his assertion that hiring decisions at the SFPUC are biased in favor of Asians.

6    *Id.* at ECF pp. 13-14. In particular, he points to Chen's testimony that interviewers do not always

7    write down everything the interviewee said, arguing that "since everything is not recorded from

8    the candidates, there's the possibility of mistakes and bias by the interviewer." Rogers Motion at

9    ECF p. 12 (citing Chen Dep. at 18-19). He also notes that although Chen testified that the hiring

10   managers are "not allowed to see" applicants' race, Huang and Thaik deviated from that policy by

11   participating in his interview. *Id.* at ECF p. 14.

12        With respect to the notes of the interviewers regarding Rogers' interview performance,

13   Rogers asserts that Volynets' comment that he did not have "enough experience and knowledge in

14   the area for hiring" was "highly untrue" and that "Volynets gave . . . Rogers lower scores than

15   other similarly situated candidates that both gave similar answers to the questions asked." *Id.* at

16   ECF p. 15. He notes that "Volynets never wrote any derogatory notes in relation to plaintiff's

17   answers other than in the overall comments of the interview form." *Id.* Rogers contends Huang's

18   interview notes did not include any "derogatory comments" but that Huang rated Rogers

19   "average" on questions 2 through 4 "even though other interviewees were given higher scores

20   from essentially the same similar notes." *Id.* As to question 1, Huang noted that Rogers did not

21   provide examples, but Rogers asserts that he was not asked to provide any examples. *Id.* Rogers

22   contends Thaik's overall comments indicated she found that he had the requisite knowledge and

23   experience for the position, but she "still gave Plaintiff Rogers a lower score for no apparent

24   reason disclosed from her own notes." *Id.* at ECF pp. 15-16. Rogers contends, "Thaik's

25   inconsistent scoring gave Plaintiff Rogers an overall lower score than most of all the other

---

[7] Although Rogers filed a declaration in support of his summary judgment motion, he did not authenticate this exhibit. Nor did he supply a declaration from anyone else to authenticate this document. It is unclear who created this chart or how it was created.

United States District Court
Northern District of California

candidates for essentially the same responses." *Id.* at ECF p. 16. Overall, Rogers contends he was "somehow given a much lower score on the interview portion for essentially the same responses as the other candidates who interviewed for the position." *Id.* at ECF p. 16. He contends, "the less qualified candidates were given more favorable treatment who were of a different racial group than Mr. Rogers, namely Asian females." *Id.*

Rogers contends the hiring process for the 1632 Senior Account Clerk was "substandard and absurd" and that the "SFPUC apparently gives no consideration for education, skills, or experience." *Id.* at ECF p. 20. He contends he has more experience than the three applicants who were offered the position, offering as evidence the applications of those three candidates for the same position, in which each one described their relevant experience. *Id.* at ECF pp. 22-23 (citing Rogers Ex. R, S, T). He further asserts that the City "is racially biased when hiring candidates for certain positions such as accounting and finance personnel." *Id.* In addition to pointing to Exhibit V, discussed above, he cites to Chen's testimony that currently there is only one African-American employee on the teams that she supervises. *Id.* at ECF p. 24.

Plaintiff argues that he has established that he was qualified for the position and that the City has offered no legitimate, non-discriminatory reason for failing to hire him. *Id.* at ECF pp. 28-31. He further contends that even if the City offered a legitimate, non-discriminatory reason for failing to hire him, he has presented sufficient evidence to establish that the reason was pretextual. *Id.* at ECF pp. 31-33.

In response to Rogers' Motion, the City asserts that "there is no competent direct or circumstantial evidence from which a jury could conclude that his race was a factor, especially in light of affirmative testimony from the interview panel explaining the basis for selecting others over Rogers, Rogers' poor interview performance, and their unequivocally [sic] statements that Rogers's race had nothing to do with his failure to be selected." Defendant's Opposition at 5. First, it objects to Exhibit V on the basis that it is unauthenticated and that it "appears that Rogers created this document based on his own assumption as to the race of the employees involved." *Id.*

United States District Court
Northern District of California

11

United States District Court
Northern District of California

at 10.[8] Next, with respect to Rogers' Title VII and FEHA claims, the City asserts that Rogers has not made a prima facie case of discrimination, requiring that he establish a causal link between his race and the SFPUC's failure to hire him. *Id.* at 10-12. Similarly, the City contends, the equal protection claim fails because Rogers has not shown that he was treated differently from other similarly situated individuals, as also argued in Defendants' Motion (discussed below). Furthermore, the City asserts, Rogers cannot establish liability as to the City because he has not met the requirements of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), as is also addressed in Defendants' Motion. *Id.* at 13-15.

In his reply brief, Rogers contends the City's opposition is "bereft of any argument that the Plaintiff is not entitled to summary judgment on his title VII (Cause of action One) and FEHA discrimination claims (Cause of Action Three and Five [sic])." Reply to Defendant City and County of San Francisco's Opposition to Plaintiff's Motion for Summary Judgment, dkt. no. 80 ("Rogers Reply") at 6. Therefore, Rogers asserts, the City has conceded that he is entitled to summary judgment on those claims. *Id.*

Rogers rejects the City's argument that it has articulated a legitimate, non-discriminatory reason for its failure to hire him, challenging the City's assertion that he performed poorly in the interview and its reliance on declarations obtained from the interviewers purporting to explain their responses, which Rogers contends are fabricated. Rogers Reply at 7-11. He reiterates his argument that the scores he received on the interview were based on racial bias, asserting that other candidates who apparently gave similar responses (based on the similarity of the interviewers' comments about those candidates' responses) were scored higher than he was. *Id.* at 12. He further contends an inference of discriminatory intent arises from the fact that the SFPUC EEO department did not conduct an adequate investigation of the discrimination claim he lodged on March 8, 2023. *Id.* at 12-13.

In addition, Rogers asserts that he has offered evidence sufficient to establish that the City

---

[8] In this section of the brief, Defendants also make a reference to Rogers Ex. Z. *See* Defendants' Opposition at 8. Defendants confirmed at the motion hearing that this is a typographical error and that Defendants meant to refer to Exhibit V.

has engaged in a pattern and practice of racial discrimination. *Id.* at 13-15. He points to "numerous race discrimination complaints" that have been filed against the City, citing his own request for judicial notice, which contains excerpts from other cases in which plaintiffs have alleged that the City of San Francisco has systematically discriminated against African-Americans in its hiring, resulting in significant underrepresentation of African-American employees in the City's workforce. *Id.* at 13 (citing generally Rogers Request for Judicial Notice ("Rogers RJN"), dkt. no. 72). He also asserts that "the City has the audacity to put Asian hiring managers exclusively in control and power to hire only Asians for open positions in their Accounting and Finance department." *Id.* at 14.

### 2. Defendants' Motion

Defendants argue that they are entitled to summary judgment on all of Rogers' claims for the same reasons they oppose Rogers' Motion, namely, because "there is no competent direct or circumstantial evidence from which a jury could conclude that his race was a factor, especially in light of affirmative testimony from the interview panel explaining the basis for selecting others over Rogers, Rogers' poor interview performance, and their unequivocally [sic] statements that Rogers's race had nothing to do with his failure to be selected." Defendant City and County of San Francisco's Motion for Summary Judgment, dkt. no. 70 ("Defendant's Motion") at 7.

The City argues that Rogers' Title VII and FEHA claims fail because he cannot show a causal link between his race and the SFPUC's failure to hire him, emphasizing that "<u>Rogers's burden is also not met simply because he belongs to a different protected category than the alleged bad actor, or from someone allegedly provided more favorable treatment.</u>" *Id.* at 9 (emphasis in original) (citing *Guthrey v. State of Cal.*, 63 Cal. App. 4th 1108, 1118 (1998)). The City further contends it had a legitimate, nondiscriminatory reason for not selecting Rogers for the position. *Id.* at 10. In particular, it did not hire him for the position because his interview score ranked seventh out of eight candidates that were interviewed. *Id.*

The City also offered declarations from the three interviewers to support its assertion that Rogers performed "poorly" at his interview. *Id.* Huang, who noted in his interview notes as to Rogers' response to question 1 that "no examples [were] provided," states:

13

United States District Court
Northern District of California

1

> With regard to Plaintiff Brian Rogers, I recall that he performed poorly in the interview because his answers were short and basic, and most importantly he did not give specific examples to bolsters his very vague answers. He appeared to be simply reciting the job description back to us. He did not seem very enthusiastic about the job or the interview. Other candidates gave specific examples from previous experience, and had experience which more closely matched our needs, which was demonstrated and emphasized during their interviews.

Huang Decl. ¶ 10 & Ex. A.  Huang further stated that he "did not base any part of [his] interview scoring, consideration, or selection process on the race of any of the candidates."  Huang Decl. ¶ 11.

Thaik described Rogers' interview performance as follows:

> With regard to Plaintiff Brian Rogers, I recall that while he was able to answer all the questions, his responses were generic and vague. They lacked specific examples from his previous experience, details, and important components which were called for by the questions, such as prioritization. He also failed to demonstrate initiative, such as proposing goals for system improvements. I was looking for interest in the position, eagerness to learn and be trainable, and enthusiasm to be part of a team, in addition to simply possessing the minimum required experience.

Thaik Decl. ¶ 10. Like Huang, Thaik also stated that she not did not "base any part of [her] interview scoring, consideration, or selection process on the race of any of the candidates." *Id.* ¶ 11.

Volynets described her impressions of Rogers in the interview as follows:

> With regard to Plaintiff Brian Rogers, I recall that he performed poorly in the interview because his answers were short and not sufficiently complete, and he did not seem enthusiastic at all about the role. He also did not have very much government accounting experience specifically.

Volynets Decl. ¶ 10.  Volynets, like the other interviewers, states that she not did not "base any part of [her] interview scoring, consideration, or selection process on the race of any of the candidates." *Id.* ¶ 11.

Likewise, the City argues that Rogers' equal protection claim fails because he cannot establish that there is a material issue of fact as to whether the decision not to hire him was based on racial animus.  Defendant's Motion at 11.  In particular, the City asserts that Rogers has offered neither direct nor circumstantial evidence that City's conduct was based on Rogers' race.  *Id.*

14

1    Furthermore, Defendant argues, because Rogers brings his equal protection claim under

2    Section 1983, the City can be liable only if he meets the requirements of *Monell v. Dep't of Soc.*

3    *Servs.*, 436 U.S. 658 (1978). *Id.* at 12-14. According to the City, Rogers cannot meet that

4    requirement because he has offered no evidence that the individuals who made the hiring decision

5    were final policy makers. *Id.* at 12-13. Moreover, the City asserts, the "Charter of the City and

6    County of San Francisco makes clear that the Civil Service Commission ('CSC') is the final

7    policymaker with respect to employment matters." *Id.* at 13 (citing Defendant's Request for

8    Judicial Notice, dkt. no. 70-6 (Defendant's RJN"), Ex. F (S.F., Cal. Charter art. X, § 10.101)).

9    The City further asserts that Rogers cannot satisfy the requirements of *Monell* because he has not

10   "identified  a specific policy of the City or the CSC that caused his alleged injuries." *Id.* Nor has

11   he shown that there is any "longstanding unconstitutional City custom" that would give rise to

12   liability. *Id.*

13       Rogers did not file an opposition brief in response to Defendant's Motion.

### III.    ANALYSIS

#### A.    Legal Standards Governing Summary Judgment

16       Summary judgment on a claim or defense is appropriate "if the movant shows that there is

17   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

18   law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show

19   the absence of a genuine issue of material fact with respect to an essential element of the non-

20   moving party's claim, or to a defense on which the non-moving party will bear the burden of

21   persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has

22   made this showing, the burden then shifts to the party opposing summary judgment to designate

23   "specific facts showing there is a genuine issue for trial." *Id.* On summary judgment, the court

24   draws all reasonable factual inferences in favor of the non-movant. *Scott v. Harris*, 550 U.S. 372,

25   378 (2007).

#### B.    Evidentiary Objections and Requests for Judicial Notice

27       Both Rogers and the City have filed requests for judicial notice. *See* dkt. nos. 72 ("Rogers

28   RJN"),  70-6 ("Defendant's RJN"). The City requests judicial notice of various municipal

United States District Court
Northern District of California

1   enactments.  As these are "not subject to reasonable dispute" and their accuracy can be "readily

2   determined from sources whose accuracy cannot reasonably be questioned[,]" the Court GRANTS

3   Defendant's RJN and takes judicial notice of the documents attached thereto pursuant to Rule 201

4   of the Federal Rules of Evidence.

5         Rogers ask the Court to take judicial notice of four documents that were filed in federal or

6   state courts and an article that was apparently published in a publication called "Mission Local."

7   As to the court filings, the Court GRANTS Rogers' request, but only "only for the limited purpose

8   of recognizing the "judicial act" that the order [or filing] represents on the subject matter of the

9   litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citing *Liberty Mut. Ins.*

10  *Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)); *see also San Luis v.*

11  *Badgley*, 136 F.Supp.2d 1136, 1146 (E.D. Cal. 2000) (a court "may take judicial notice of a

12  document filed in another court not for the truth of the matters asserted in the litigation, but rather

13  to establish the fact of such litigation and related filings"). The Court DENIES Rogers' request as

14  to the "Mission Local" article as Rogers has not provided any information about this publication

15  that establishes that the existence of this article or the facts contained therein meet the

16  requirements of Rule 201.

17        The Court sustains the City's objection to Rogers Exhibit V.   Only admissible evidence is

18  considered on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th

19  Cir. 2002).  Authentication of evidence is a "condition precedent to admissibility," and can be

20  satisfied by "evidence sufficient to support a finding that the item is what the proponent claims it

21  is." *Id.* (citing F.R.Evid. 901(a)).  Here, Rogers does not explain *what* this document purports to

22  be or offer evidence that it is what it claims to be.  Therefore, the Court finds that this document

23  cannot properly be considered in deciding the motions presently before the Court. For the same

24  reasons, the Court declines to consider Rogers Exhibit B-1, which appears to contain search

25  results from a database that Plaintiff represented at the motion hearing  is maintained by a private

26  entity that collects government data.

27        **C.    Discriminatory Intent**

28        Rogers asserts that the City discriminated against him based on race by failing to hire him

United States District Court
Northern District of California

16

United States District Court
Northern District of California

for the 1632 Senior Account Clerk position at the SFPUC, violating his rights under the Equal Protection Clause, Title VII and FEHA. All three claims require that he establish that the City acted with discriminatory intent. *See Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022) ("The central inquiry in an Equal Protection Clause claim is whether a government action was motivated by a discriminatory purpose."); *Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*, 694 F.2d 531, 537 (9th Cir. 1982) ("By their very nature, [Title VII disparate treatment] claims require proof of intentional discrimination."); *Vallimont v. Chevron Rsch. & Tech. Co.*, No. C 08-01227 JSW, 2009 WL 10680211, at *4 (N.D. Cal. Oct. 8, 2009), aff'd sub nom. *Vallimont v. Chevron Energy Tech. Co.*, 434 F. App'x 597 (9th Cir. 2011) (dismissing FEHA claim on summary judgment because plaintiff was "unable to demonstrate that there [were] any circumstances suggesting discriminatory intent.").[9]

"Where direct evidence [of discriminatory intent] is unavailable, plaintiffs can, and frequently do, rely on the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as a way of channeling inquiry into the available circumstantial evidence." *Ballou*, 29 F.4th at 422. "That framework originated in cases interpreting Title VII of

---

[9] The Court notes that under both Title VII and FEHA, a claim for racial discrimination may be brought on a theory of disparate treatment or disparate impact. " 'Disparate treatment' is demonstrated when the employer simply treats some people less favorably than others because of [a protected characteristic]. . . . 'Disparate impact' is demonstrated when 'employment practices that are facially neutral in their treatment of different groups ... fall more harshly on one group than another and cannot be justified by business necessity.' " *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1049 (9th Cir. 2012) (quoting *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir.2003) (internal quotation marks omitted)). "Summary judgment [on a disparate impact claim] is appropriate when statistics do not support a disparate impact analysis." *Pottenger*, 329 F.3d at 749. Here, Rogers does not appear to have asserted a disparate impact claim as he does not explicitly allege that any facially neutral employment practice had a disparate impact on African-American applicants generally. To the extent his FEHA and Title VII claims might be construed as disparate impact claims based on reliance on interview scores obtained using a standardized interview form to hire for the 1632 Senior Account Clerk position, he has not offered any statistical evidence to support that claim. Even if the Court were to consider the exhibits Rogers has offered to show that the racial and ethnic breakdown of individuals who hold the Senior Account Clerk position (Exhibits V and B-1) is skewed in favor of Asians and against African-Americans, he has offered no meaningful statistical analysis or evidence that relates specifically to individuals who were hired for temporary positions and thus, were not chosen from the eligibility list that is used for permanent positions. Thus, he has not demonstrated that there is any material dispute of fact as to whether the exclusive reliance on the standardized interview questions for applicants seeking temporary positions results in a disproportionate adverse impact on African-American applicants. Therefore, to the extent Rogers is asserting disparate impact claims under Title VII and FEHA, the Court grants summary judgment on those claims in favor of the City.

17

1    the Civil Rights Act of 1964, which prohibits employment discrimination based on 'race, color,

2    religion, sex, or national origin,' 42 U.S.C. § 2000e-2, but its use has since expanded to other

3    discrimination statutes and to constitutional equal protection . . ." *Id.* (citation omitted).  California

4    courts also apply the *McDonnell Douglas* framework to the discriminatory intent requirement

5    under FEHA.  *Chisolm v. 7-Eleven, Inc.*, 383 F. Supp. 3d 1032, 1048 (S.D. Cal. 2019), aff'd, 814

6    F. App'x 194 (9th Cir. 2020) ("In the case of circumstantial evidence, the California Supreme

7    Court has adopted the tripartite burden-shifting framework established in *McDonnell Douglas*

8    *Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to analyze . . . discrimination claims brought under

9    FEHA.") (citing *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317 (2000)). Thus, Rogers can survive the

10   City's summary judgment challenge based on the discriminatory intent requirement either by: 1)

11   producing direct or circumstantial evidence demonstrating that a discriminatory reason more likely

12   than not motivated the City; or 2) raising an inference of discriminatory intent under the burden-

13   shifting framework of *McDonnell Douglas*.

14        Because Rogers does not dispute that there is no direct evidence of discriminatory intent

15   with respect to the City's failure to hire him, the question the Court must decide is whether he has

16   established discriminatory intent sufficient to survive summary judgment under the *McDonnell*

17   *Douglas* framework. Under the *McDonnell Douglas* framework, the plaintiff first must establish a

18   prima facie case of discrimination.  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir.

19   2010). To make a prima facie case of discrimination, a plaintiff must show that: (1) he is a

20   member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse

21   employment action; and (4) that persons outside his protected class with equal or lesser

22   qualifications, were given more favorable treatment.  *Hodge v. Oakland Unified Sch. Dist.*, No. C

23   09-04719 RS, 2012 WL 1933678, at *4 (N.D. Cal. May 29, 2012), aff'd, 555 F. App'x 726 (9th

24   Cir. 2014). In a failure to hire case, the fourth element may be satisfied where the plaintiff shows

25   that an individual outside of the protected class with similar or lesser qualifications was offered

26   the position, *Sakellar v. Lockheed Missiles & Space Co.*, 765 F.2d 1453, 1455 (9th Cir. 1985), or

27   "that, after [the plaintiff's] rejection, the position remained open and the employer continued to

28   seek applicants from persons of complainant's qualifications."  *McDonnell Douglas*, 411 U.S. at

802.[10]  "[T]he degree of proof necessary to establish a prima facie case is 'minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994)).

If the plaintiff establishes a prima facie case, the burden of production, but not persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged actions. *Hawn*, 615 F.3d at 1155.  If this burden is met, the plaintiff "must then raise a triable issue of material fact as to whether the defendant's proffered reasons for [the challenged conduct] are mere pretext for unlawful discrimination." *Id.*  "The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220-22 (9th Cir. 1998), as amended (Aug. 11, 1998)).  The employee must offer "'specific, substantial evidence of pretext.'" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir.1994) (quoting *Steckl v. Motorola*, 703 F.2d 392, 393 (9th Cir.1983)).

---

[10] In its summary judgment motion and its opposition to Rogers' summary judgment motion, the City states that the fourth element of the prima facie case is "that there is a causal link between his protected status and the adverse action."  Defendant's Motion at 9; Defendant's Opposition at 10.  The City cites two cases to support its characterization of the elements of a prima facie case of discrimination: *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840 (9th Cir. 2004) and *Surrell v. California Water Serv. Co.*, 518 F.3d 1097 (9th Cir. 2008).  Neither case supports Defendant's characterization of the fourth element of the prima facie case.  In *Fonseca*, the court set forth the following elements of the prima facie case:  "Fonseca may establish a prima facie case of discrimination under the McDonnell Douglas framework by showing that: '(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." 374 F.3d  at 847 (quoting *Peterson v. Hewlett–Packard Co.*, 358 F.3d 599, 604 (9th Cir.2004)).  In *Surrell*, the court set forth the classic elements of the test, taken directly from *McDonnell Douglas*: "the plaintiff must show that (1) she is a member of a protected class; (2) she applied for a job for which she was qualified; (3) she was rejected; and (4) the position remained open and the employer sought other similarly-qualified employees." 518 F.3d at 1105–06 (citing *McDonnell Douglas*, 411 U.S. at 802).  While the Supreme Court recognized in *McDonnell Douglas* that the formulation of the prima facie case test is not rigid and may vary depending on the specific factual circumstances of the case, *see* 411 U.S. at 802 n. 13, the vague formulation offered by the City with respect to the fourth element does not track with existing case law applying the prima facie case requirement (including the cases Defendant has cited).  The Court therefore concludes that the City's description of the prima facie case requirement is incorrect as a matter of law.

United States District Court
Northern District of California

1    The Court assumes that Rogers has made a prima facie case of discrimination. The City, in

2    turn, has articulated a legitimate, non-discriminatory reason for failing to hire Rogers, namely, that

3    the cumulative score he obtained on his interview responses was lower than the scores obtained by

4    the applicants who were offered the job and the hiring decision was made solely on the basis of the

5    applicants' interview performance. Consequently, Rogers must offer "specific, substantial

6    evidence of pretext" to avoid summary judgment. Rogers attempts to do this by showing that the

7    City's "proffered explanation is unworthy of credence because it is inconsistent or otherwise not

8    believable." The Court concludes, however, that the evidence he offers is insufficient to establish

9    pretext.

10    First, Rogers contends the scoring on the standardized form is subjective and that the

11    interviewers were inconsistent in assigning numeric values to candidates' answers, sometimes

12    assigning Rogers a lower score on a particular question than they gave other applicants even

13    though their comments were similar. Rogers Motion at 23-24.   This argument is neither specific

14    nor supported by substantial evidence. As to Volynets, Rogers asserts generally that she "gave

15    plaintiff Rogers lower scores than other similarly situated candidates that both gave similar

16    answers to the questions asked." Rogers Motion at 22. Rogers did not pinpoint any specific

17    comments, however, and it is unclear what comments Rogers considered to be similar. The Court

18    has reviewed the Volynets interview notes and does not find any comments relating to other

19    candidates that are similar enough to comments about Rogers to support an inference that her

20    lower scoring of Rogers was based on his race and not his interview answers. Similarly, Rogers'

21    assertions that Huang gave other candidates higher scores even though his notes for those

22    candidates were similar to his notes on Rogers' responses are vague and unspecific. *See* Rogers

23    Motion at 23 (asserting that on "questions 2 through 4" Huang rated Rogers "average even though

24    other interviewees were given higher scores from essentially the same similar notes"). Nor does

25    the Court find that there are any notes related to other applicants who received a higher score that

26    are so similar to comments related to Rogers' response that they give rise to an inference that

27    Huang's scoring was based on Rogers' race rather than his interview responses.

28    Likewise, Roger makes the conclusory assertion that Thaik's scoring was "inconsistent"

1    because she acknowledged in her overall comments that Rogers was "able to answer all questions"

2    and had "AP, AR, GL, and Accounting Cycle [Experience]" but "still gave Plaintiff Rogers a

3    lower score for no apparent reason disclosed from her own notes." *Id.* at 23-24.  Yet Thaik's

4    overall comment offers a reason for her low scores, namely, her impression that Rogers' responses

5    where characterized by "short mentioning."  Chee Decl., Ex. E.  Thaik's interview scores, like the

6    scores of Huang and Volynets do not offer specific or substantial evidence of pretext.[11]

7          Rogers also relies heavily on the race of the interviewers in arguing that the scores he was

8    given were based on his race.  But the mere fact that the interviewers were not members of the

9    same protected group as Rogers is not specific or substantial evidence of pretext.  *See Guthrey v.*

10   *State of Cal.*, 63 Cal. App. 4th 1108, 1118 (1998).

11         Next, Rogers asserts that the SFPUC's failure to investigate his EEO complaint, filed on

12   March 8, 2023, gives rise to an inference of discriminatory intent. A failure to investigate a

13   discrimination claim by a member of a protected class may constitute an equal protection violation

14   where it is shown that others who are outside of the protected group were treated more favorably.

15   For example, in *Elliot-Park v. Manglona*, the Ninth Circuit found that the plaintiff stated a viable

16   equal protection claim based on the allegation that police officers refused to investigate a drunk

17   driving accident where the driver (like the officers) was Micronesian and the other driver (the

18   plaintiff in the case) was Korean where the plaintiff also alleged that one of the officers who

19   refused to investigate "fully investigated another drunk driving accident that occurred the same

20   evening where the victim was Micronesian but the driver wasn't." 592 F.3d 1003, 1006 (9th Cir.

21   2010).

22         Here, however, the only evidence Rogers provides to support this argument is an email that

23   he sent to the SFPUC EEO department inquiring about the status of the investigation and

24   complaining that it had been "over four months" since he filed his complaint.  Rogers Reply Decl.,

25

26   _____

27   [11] Rogers challenges the declarations of Volynets, Thaik and Huang, in which the interviewers
     offer more detailed explanations of their interview notes, on the basis that they are "fabricated"
     and conflict with the interviewers' contemporaneous notes.  Rogers Reply at 7-11.  The Court
28   does not reach this objection, however, because it does not rely on these declarations in support of
     its holding herein.

1   Ex. B, dkt. no. 80-1 at ECF pp. 6-9.  In the email response, dated July 11, 2023, Jennifer Burke

2   (described in her signature block as EEO Programs Manager Department of Human Resources)

3   apologized for the delay and stated that "[t]he City aims to complete its EEO investigations within

4   180 days; however, we are not always able to meet that timeline. The City's EEO units will

5   complete our investigation of your matter as soon as we are able." *Id.*  In contrast to the facts of

6   *Elliot-Park*, Rogers does not point to any evidence showing that the investigation of his complaint

7   was handled differently than any other investigation that did not involve a member of the same

8   protected group or even that the 4-month delay he experienced was atypical.

9       Therefore, this evidence does not give rise to an inference of discriminatory intent and

10  does not establish that the City's reasons for failing to hire him were pretextual.

11      Finally, Rogers points to evidence that there are very few African-Americans employed by

12  the City in the 1632 Senior Account Clerk position. While the exhibits he offered to show this are

13  not admissible, he does point to admissible evidence to support this assertion, namely, the

14  deposition testimony of Vivian Chen that currently only one person out of the 60 people she

15  supervises is African-American. Chen Dep. at 32. Rogers has not, however, offered any evidence

16  linking this underrepresentation of African-Americans to the specific hiring decision that is at

17  issue in this case.   Furthermore, as discussed above, to establish disparate impact discrimination

18  based on the City's general hiring practices (as opposed to Rogers' treatment by the City in

19  connection with the specific hiring decision that is at issue in this case), he must point to a specific

20  neutral practice and offer evidence showing that that practice has resulted in a statistical imbalance

21  with respect to the hiring of African-Americans.  Rogers has not done so.

22      **D.    *Monell*  Liability**

23      The City argues that as to Rogers' equal protection claim, the claim fails for the additional

24  reason that the City cannot be held vicariously liable under 42 U.S.C. § 1983 and he cannot

25  establish liability under *Monell v. Department of Social Services of City of New York*, 436 U.S.

26  658 (1978).  The Court agrees.

27      In *Monell*, the Supreme Court found that "municipalities are 'persons' subject to damages

28  liability under section 1983" but that "the municipality itself must cause the constitutional

United States District Court
Northern District of California

1    deprivation and that a city may not be held vicariously liable for the unconstitutional acts of its

2    employees under the theory of *respondeat superior*."  *Gillette v. Delmore*, 979 F.2d 1342, 1346

3    (9th Cir. 1992) (citing *Monell*, 436 U.S. at 691). Thus, a municipality may be liable under Section

4    1983 only if: 1) the alleged constitutional violation was committed pursuant to an official policy or

5    longstanding practice; 2) "the individual who committed the constitutional tort was an official

6    with 'final policy-making authority' and . . . the challenged action itself thus constituted an act of

7    official governmental policy[;]' " or 3)  "an official with final policy-making authority ratified a

8    subordinate's unconstitutional decision or action and the basis for it." *Id.* at 1347.

9         Rogers contends there is a "pattern or practice" of racial discrimination in the City's hiring

10   for SFPUC positions, citing the low percentage of African-American employees and high

11   percentage of Asian employees at the SFPUC in the Accounting and Finance department and

12   asserting that this racial disparity is the result of the City's policy of "put[ting] Asian hiring

13   managers exclusively in control and [giving them] power to hire only Asians for open positions in

14   their Accounting and Finance department."  Rogers Reply at 13-14. The only evidence in the

15   record relating to hiring managers, however, relates to the hiring managers for the specific position

16   for which Rogers applied, who Chen testified were Huang and Thaik.  Even assuming both

17   individuals are Asian, as Rogers contends, there is no evidence as to whether the hiring managers

18   for other job openings in the Accounting and Finance Department at SFPUC were Asian.  Thus,

19   Rogers has not demonstrated the existence of a material issue of fact as to the existence of a

20   "widespread practice that . . . is so permanent and well settled as to constitute a 'custom or usage'

21   with the force of law[,]" as is required under *Monell*.  *Gillette*, 979 F.2d at 1349. Moreover, to the

22   extent Rogers might be relying on the City's practice of using the five-question standardized

23   interview form as the basis for hiring temporary employees, he has not pointed to evidence

24   sufficient to survive summary judgment that that practice is the "moving force" of any

25   constitutional violation.  *Monell*, 436 U.S. at 694.  At best, the subjective nature of the interview

26   scoring may provide an opportunity for hiring decisions to be infected by bias.  There is no

27   evidence in the record, however, that the City's use of a standardized interview form with a list of

28   job-related questions was the *cause* of any racial discrimination in hiring.  Therefore, the Court

United States District Court
Northern District of California

23

concludes that Rogers' equal protection claim fails under *Monell*.

## IV.    CONCLUSION

For the reasons stated above, the Defendant's Motion is GRANTED. Rogers' Motion is DENIED. Plaintiff's claims are dismissed with prejudice.  The Clerk is instructed to enter judgment in favor of Defendants and close the case.

**IT IS SO ORDERED.**


Dated:  July 17, 2025

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California